**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| ASHRAF MANIAR and UMAIMA SHAIKH, |
| Plaintiffs, |
| v. |
| ALEJANDRO MAYORKAS, in his official capacity as Secretary of the United States Department of Homeland Security, *et al.*, |
| Defendants. |

Civil Action No. 19-3826 (EGS)

**MEMORANDUM OPINION**

## I.  Introduction

Plaintiffs Ashraf Maniar ("Mr. Maniar") and Umaima Shaikh ("Ms. Shaikh") (collectively, "Plaintiffs") bring this action asserting constitutional and procedural claims related to their alleged inclusion in the Terrorist Screening Dataset ("TSDS"), a governmental, interagency tool that compiles the nation's watchlists, including the No Fly List and the Selectee List. *See* Second Am. Compl. ("Compl."), ECF No. 22 at 4 ¶ 8.[1] Plaintiffs have sued various federal government officials in their official capacities (collectively, "Defendants" or "the government"),

---

[1] When citing electronic filings throughout this Memorandum Opinion, the Court cites to the ECF header page number, not the original page number of the filed document.

including Alejandro Mayorkas, Secretary of the U.S. Department
of Homeland Security ("DHS"); David Pekoske, Administrator of
the Transportation Security Administration ("TSA"); Troy Miller,
Acting Commissioner of the U.S. Customs and Border Protection
("CBP"); Merrick Garland, the U.S. Attorney General; Christopher
Wray, Director of the Federal Bureau of Investigation ("FBI");
and Charles Kable, IV, Director of the Terrorist Screening
Center ("TSC").[2] *Id.* at 3-4 ¶¶ 3-8. Plaintiffs, two U.S. citizens
married to each other who identify as practicing Muslims, *id.* at
3 ¶¶ 1-2; have alleged violations of the First and Fifth
Amendments of the U.S. Constitution and of the Administrative
Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*, and are seeking
declaratory and injunctive relief, *see id.* at 17-26.

Pending before the Court is Defendants' Renewed Motion to
Dismiss. *See* Defs.' Mot., ECF No. 23. Upon consideration of
Plaintiffs' complaint, the pending motion, the opposition, the
reply thereto, and the applicable law and regulations, the Court
**GRANTS** Defendants' Renewed Motion to Dismiss, ECF No. 23; and
**DISMISSES WITHOUT PREJUDICE** Plaintiffs' Second Amended
Complaint, ECF No. 22; for lack of subject-matter jurisdiction
pursuant to Federal Rule of Civil Procedure 12(b)(1).

---

[2] Pursuant to Federal Rule of Civil Procedure 25(d), the current
government officials holding these positions are "automatically
substituted as" Defendants for their predecessors.

2

## II.  Background

### A. Statutory and Regulatory Background

The TSC is a multi-agency executive organization created by Presidential Directive in 2003, Defs.' Mot., ECF No. 23-1 at 17; that is administered by the FBI in coordination with DHS, the Department of State, and the Department of Justice, Defs.' Ex. A, Overview of the U.S. Government's Watchlisting Process and Procedures, ECF No. 23-2 at 3 [hereinafter "Watchlisting Overview"].[3] The TSC consolidates the U.S. government's terrorist watchlists into a single database known as the TSDS,[4] which

---

[3] The Court takes judicial notice of the Watchlisting Overview, "released by the U.S. government in January 2018" and providing "a description of watchlisting policies and procedures[,]" Defs.' Mot., ECF No. 23-1 at 17 n.2; and of the other exhibits attached to Defendants' Motion to Dismiss that are also referenced in Plaintiffs' complaint, *see Patrick v. Dist. of Columbia*, 126 F. Supp. 3d 132, 135-36 (D.D.C. 2015) ("Although a court generally cannot consider matters beyond the pleadings at the motion-to-dismiss stage, it may consider 'documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss[.]'" (citation omitted)); *Ashbourne v. Hansberry*, 245 F. Supp. 3d 99, 103 (D.D.C. 2017) (noting that courts may take judicial notice of "official, public documents"); *Detroit Int'l Bridge Co. v. Gov't of Canada*, 133 F. Supp. 3d 70, 85 (D.D.C. 2015) (same conclusion for "public records and government documents available from reliable sources").

[4] The TSDS was formerly known as the Terrorist Screening Database. *See* Defs.' Ex. 3, Decl. of Jason V. Herring (TSC's Deputy Director for Operations), *Moharam v. FBI*, No. 21-2607 (JDB) (D.D.C. Jan. 18. 2022), ECF No. 20-5 at 3 ¶ 5 (explaining that the term "TSDS" "more accurately describes the terrorist screening information maintained by the TSC").

"contains both biographic and biometric identifying information
. . . of known and suspected terrorists"—which is "accessible
only to persons who have a 'need to know' such as federal law
enforcement officials for their screening and vetting
activities." *Id.* Inclusion in the TSDS results from a multi-step
nomination process, in which U.S. government agencies and
foreign partners "nominate" individuals to add to the database
where there is enough credible investigative information "to
satisfy a reasonable suspicion that the individual is a [known
or suspected terrorist]." *Id.* at 4; Defs.' Mot., ECF No. 23-1 at
18. These nominations are then reviewed by the FBI and the
National Counterterrorism Center before the TSC makes the final
determination on whether to add the nominated persons to the
TSDS. *See* Watchlisting Overview, ECF No. 23-2 at 4-5.

Once individuals are added to the database, the TSC sorts
them into subset lists, known as the No Fly List and the
Selectee List, which are used by TSA "to secure commercial air
travel against the threat of terrorism." *Id.* at 3; *see* 49 U.S.C.
§ 114(f) (providing TSA's mandate to "assess" and "deal[] with
threats to transportation security" "at airports and other
transportation facilities"); 49 U.S.C. § 44903(j)(2)(C)(ii)
(directing TSA to perform "the passenger prescreening function
of comparing passenger information to the automatic selectee and
no fly lists" to identify threats to civil aviation or national

4

security). Nominees to the No Fly and Selectee Lists "must satisfy criteria distinct from that used for mere inclusion in the TSD[S,]" Watchlisting Overview, ECF No. 23-2 at 5; with inclusion on the No Fly List being the most restrictive of the subsets, reserved for individuals presenting "a terrorist threat with respect to an aircraft, the homeland, U.S. facilities or interests abroad, or a threat of engaging in or conducting a violent act of terrorism and is operationally capable of doing so[,]" *id.*; Defs.' Mot., ECF No. 23-1 at 18. TSA prohibits individuals on the No Fly List from boarding flights on U.S. carriers, as well as flights into, out of, over, or within U.S. airspace, Watchlisting Overview, ECF No. 23-2 at 3; while it subjects individuals on the Selectee List to enhanced security screenings at airports and border crossings,[5] *id.*; Compl., ECF No. 22 at 15 ¶ 104. The U.S. government does not publicly disclose who is on either TSDS list or the criteria for placement on the Selectee List.[6] Watchlisting Overview, ECF No. 23-2 at 3, 5; Defs.' Mot., ECF No. 23-1 at 18.

---

[5] Plaintiffs allege that these enhanced screening measures "can take several hours on departing flights at U.S. airports[,]" which "can result in the individuals missing scheduled flights." Compl., ECF No. 22 at 15 ¶ 105. They also allege that "Selectee list persons often encounter extreme difficulties traveling abroad, including being detained in foreign countries . . . , or being prohibited from entering them altogether, due to the dissemination of the TSD[S] to foreign governments." *Id.* ¶ 106.
[6] According to Plaintiffs, "[p]ersons removed from the No Fly List are often demoted to the Selectee List." *Id.* at 16 ¶ 112.

The U.S. government also has a policy against informing individuals of their placement on or removal from the Selectee List, Compl., ECF No. 22 at 16 ¶ 113; although it may inform U.S. citizens and lawful permanent residents ("U.S. persons") of their presence on the No Fly List after they are denied boarding of a commercial aircraft, Watchlisting Overview, ECF No. 23-2 at 10. U.S. persons who "believe they have been unfairly or incorrectly delayed, denied boarding, or identified for additional screening or inspection at airports or U.S. ports of entry" may submit an inquiry through DHS's Traveler Redress Inquiry Program ("DHS TRIP"). *Id.* at 8; 49 C.F.R. § 1560.205(a)-(b); *see also* 49 U.S.C. §§ 44903(j)(2)(C)(iii)(I), (j)(2)(G)(i), 44926(a)-(b); 49 C.F.R. §§ 1560.201-207. As part of the inquiry, individuals must send DHS TRIP "personal information and copies of the specified identification documents."[7] 49 C.F.R. § 1560.205(c). Then, the TSC's Redress Office, "a separate component within the TSC that processes inquires related to the use of TSD[S] data by screening agencies[,]" works with DHS TRIP to review travelers' information and documentation to determine whether they "should remain in the TSD[S], be modified, or be removed[.]" Watchlisting Overview, ECF No. 23-2 at 9. If changes

---

[7] Each DHS TRIP inquiry is assigned a unique Redress Control Number, enabling individuals to check the status of their inquiry on DHS's TRIP website at any time. Watchlisting Overview, ECF No. 23-2 at 8; 49 C.F.R. § 1560.205(c).

to a record's status are warranted, the TSC's Redress Office ensures corrections are made, and then DHS TRIP "sends a determination letter advising the traveler of the results of the adjudication of the redress inquiry." *Id.* at 10.

Historically, the U.S. government did not confirm or deny for DHS TRIP complainants whether they were on the No Fly List, Compl., ECF No. 22 at 16 ¶ 114; but in 2015, in response to litigation, TSA adopted revised DHS TRIP procedures to allow disclosure of No-Fly status to U.S. persons denied boarding who thereafter file a redress inquiry, *id.* ¶ 116; Defs.' Mot., ECF No. 23-1 at 21. Complainants can "request and receive additional information" regarding the reason(s) for their status, which includes, "where possible when national security and law enforcement interests at stake are taken into account, an unclassified summary of information supporting the individual's No Fly List status[,]" and they may also submit information in rebuttal to their No-Fly designation. *See* Compl., ECF No. 22 at 17 ¶¶ 118-121 (stating that upon election by the traveler to receive more information, "DHS TRIP commits to [ ] provide a second, or 'stage-two' letter, including the specific criteria under which the individual has been placed on the No Fly List"); Watchlisting Overview, ECF No. 23-2 at 10 (noting that "[t]he amount and type of information provided will vary on a case-by-case basis," and in some instances, an unclassified summary may

not be provided due to national security concerns). The TSC will then review the complainant's file and either: (1) remove the person from the No Fly List if it determines that such status is unwarranted; or (2) conclude that the person should stay on the No Fly List and provide a recommendation as such to the TSA Administrator. Watchlisting Overview, ECF No. 23-2 at 9-10; Compl., ECF No. 22 at 17 ¶ 122. The TSA Administrator "makes final determinations concerning listing on the No Fly List[,]" Watchlisting Overview, ECF No. 23-2 at 10 n.5; and will issue a final order either maintaining or removing the person's No-Fly status, or alternatively remanding the matter back to the TSC for more information or clarification, *id.* at 10. If TSA issues a final order maintaining the person's No Fly List designation, DHS TRIP will send the complainant a determination letter, which states the basis for the decision "to the extent feasible in light of national security and law enforcement interests at stake," and notifies the person of the ability to seek judicial review in the appropriate Court of Appeals. *Id.*; Compl., ECF No. 22 at 17 ¶ 123; *see also* 49 U.S.C. § 46110(a) ("[A] person disclosing a substantial interest in an order issued by . . . the Administrator of the [TSA] . . . may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court

of appeals of the United States for the circuit in which the
person resides or has its principal place of business.").[8]

Selectee List persons are also sent "a determination letter
advising [them] of the results of the adjudication of the
redress inquiry[,]" Watchlisting Overview, ECF No. 23-2 at 10;
but this response does not confirm or deny travelers' inclusion
in or deletion from that list,[9] Compl., ECF No. 22 at 16 ¶ 117,
17 ¶ 124; information which is protected by the law enforcement
privilege and as Sensitive Security Information pursuant to 49
U.S.C. § 114(r), Defs.' Mot., ECF No. 23-1 at 14 n.1, 18; *see
also* 49 C.F.R. § 1520.5(b)(9). "Individuals who are not on the

---

[8] Prior to the 2015 revisions to DHS TRIP procedures, the TSC was
the "sole entity with . . . the authority to remove names from
the No-Fly List/TSD[S.]" *Ege v. DHS*, 784 F.3d 791, 795 (D.C.
Cir. 2015) (citation and internal quotation marks omitted).
However, under the current procedures, "the TSA Administrator is
solely responsible for issuing a final order maintaining a
traveler on the No Fly List. TSC submits a *recommendation*, along
with supporting materials, to the TSA Administrator[,]" who
"ultimately issues the final order[.]" *Kashem v. Barr*, 941 F.3d
358, 391 (9th Cir. 2019); *accord Busic v. TSA*, No. 20-1480, 2023
WL 2565069, at *1 (D.C. Cir. Mar. 20, 2023).
[9] According to plaintiffs in similar cases, "the standard
response sent to people who are not on the No Fly List, but who
could be on the Selectee List" states as follows: "DHS has
researched and completed our review of your case. DHS TRIP can
neither confirm nor deny any information about you which may be
within federal watchlists or reveal any law enforcement
sensitive information. However, we have made any corrections to
our records that our inquiries determined were necessary,
including, as appropriate, notations that may assist in avoiding
incidents of misidentification." *Jibril v. Mayorkas*, 20 F.4th
804, 810-11 (D.C. Cir. 2021); *see also Matar v. TSA*, 910 F.3d
538, 540 (D.C. Cir. 2018) (indicating that the petitioner
received a letter with identical wording from DHS TRIP).

No Fly List, but who may be on the Selectee List, are therefore often unable to receive a response that meaningfully informs them of the results of their DHS TRIP inquiry." *Jibril v. Mayorkas*, No. 1:19-cv-2457 (RCL), 2023 WL 2240271, at *1 (D.D.C. Feb. 27, 2023) [hereinafter "*Jibril III*"].[10]

### B. Factual and Procedural Background

The following facts reflect the allegations in the Complaint and the documents incorporated by reference therein, which the Court assumes are true for the purposes of deciding this motion and construes in Plaintiffs' favor. *See Baird v. Gotbaum*, 792 F.3d 166, 169 n.2 (D.C. Cir. 2015).

Plaintiff Ashraf Maniar is a U.S. citizen by birthright and of Pakistani national origin. Compl., ECF No. 22 at 3 ¶ 1. Plaintiff Umaima Shaikh is a U.S. citizen of Pakistani national origin who acquired citizenship at birth due to the U.S. citizenship of a parent. *Id.* ¶ 2. Plaintiffs identify as practicing Muslims and are a married couple living together in

---

[10] *Jibril III* is the most recent decision issued by this Court regarding TSDS watchlists. It is preceded by *Jibril v. Wolf*, No. 1:19-cv-2457 (RCL), 2020 WL 2331870 (D.D.C. May 9, 2020), which was affirmed in part and reversed in part by *Jibril v. Mayorkas*, 20 F.4th 804 (D.C. Cir. 2021) ("*Jibril II*"). The Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") remanded the case for further proceedings consistent with its opinion, which culminated in *Jibril III*, decided on February 27, 2023. Although these cases primarily concerned the Jibrils' alleged placement on the Selectee List, the Court relies on *Jibril II* and *Jibril III* in its analysis of Plaintiffs' No Fly List and Selectee List claims. *See infra* section IV.A.

North Carolina. *Id.* ¶¶ 1-2. Neither has a history of mental health concerns, *id.* at 5 ¶ 13, 10 ¶ 64; nor have they ever been convicted of or charged with criminal activity, *id.* at 10 ¶ 63; Pls.' Opp'n, ECF No. 25 at 9. Both Plaintiffs have "experienced ongoing and severe difficulties in airport travel," including "the inability to print boarding passes and the inability to board a plane," with Mr. Maniar also once "being escorted out of the airport." Compl., ECF No. 22 at 5 ¶ 19, 10 ¶ 65. They have also encountered difficulties with ground travel within the U.S. and traveling via car to Canada. *See id.* at 9 ¶¶ 50-54, 10-11 ¶¶ 66-67. Plaintiffs were placed on the No Fly List, *id.* at 7 ¶ 36, 12 ¶ 78; but have both since been removed from that list, *id.* at 8 ¶ 44, 13 ¶ 88. The facts of their alleged experiences pertaining to their designations on and subsequent removals from the No Fly List are detailed separately below.

### 1. Plaintiff Ashraf Maniar

Mr. Maniar has business and religious interests involving travel abroad. *See id.* at 5 ¶¶ 15-18. First, he maintains commercial ventures in Malaysia via online business transactions. *Id.* ¶ 15. Second, as a practicing Muslim with sincerely held religious beliefs, he intends to travel to Saudi Arabia to complete Hajj and Umrah, two religious pilgrimages. *Id.* ¶¶ 15-18. Mr. Maniar has traveled to Saudi Arabia for Umrah in the past and hopes to complete Hajj in the future. *Id.* ¶ 17.

Mr. Maniar alleges that because of his placement on the No Fly
List, he was "unable to travel to Saudi Arabia to complete Hajj
and pilgrimage requirements, or participate in chosen employment
and business ventures." *Id.* ¶ 20, 9 ¶ 56.

Mr. Maniar recalls being prohibited from flying for the
first time in May 2017, *id.* ¶ 22; and as a result, he filed his
first DHS TRIP inquiry around that time, *id.* at 6 ¶ 23. Although
he was permitted to fly in November 2017 from Boston to Los
Angeles, *id.* ¶ 25; he claims his travel experiences worsened
thereafter despite the initiation of his inquiry, *id.* ¶ 26.
First, on December 14, 2017, FBI agents raided Mr. Maniar's
house pursuant to a warrant and seized his electronics and
passport. *Id.* ¶¶ 27-28. Then, on December 16, 2017, Mr. Maniar
booked a flight from Nevada to Georgia to attend his wedding in
Atlanta, but two days later, when he tried to board his flight,
he was not allowed to print his boarding pass, was prohibited
from flying, and was escorted out of the airport. *Id.* ¶¶ 29-31.
These events led Mr. Maniar to initiate another DHS TRIP inquiry
on February 21, 2018 to "acquire information as to whether he
[was] on the No Fly List, the reasons for that designation, if
any, and a way to appeal any determination." *Id.* ¶ 32.

On June 7, 2018, Mr. Maniar filed a Petition for Writ of
Mandamus in this Court, explaining his travel difficulties and
seeking to compel DHS TRIP "to provide an initial determination

as to whether or not [he was] on the No Fly List" in line with
the applicable regulations regarding redress. *Id.* at 7 ¶ 35;
Pet. for Writ of Mandamus, *Maniar v. Nielsen*, No. 18-1362 (RDM)
(D.D.C. June 7, 2018), ECF No. 1 at 5.[11] On June 27, 2018, DHS
sent Mr. Maniar a letter confirming his placement on the No Fly
List because, following a review of his records "in consultation
with other federal agencies," he was "identified as an
individual who 'may be a threat to civil aviation or national
security.'" Defs.' Ex. B, ECF No. 23-3 at 2 (quoting 49 U.S.C. §
114(h)(3)(A)). No other information as to the reasons for his
No-Fly designation were provided in the letter. *See id.;* Compl.,
ECF No. 22 at 7 ¶¶ 36-38. That same day, Mr. Maniar's counsel
contacted DHS TRIP to notify the agency that its letter was
"insufficient" given Mr. Maniar's entitlement to "the specific
criterion under which [he was] placed on the No Fly List and . .
. an unclassified summary of information supporting [his] No Fly
List status[.]" Compl., ECF No. 22 at 7 ¶ 39.

On October 30, 2018, DHS TRIP issued Mr. Maniar a stage-two
letter that provided him with "an unclassified summary that
include[d] the reasons supporting [his] placement on the No Fly
List . . . to the extent feasible," after considering national

---

[11] This matter was voluntarily dismissed on August 19, 2020
following Mr. Maniar's removal from the No Fly List. *See* Notice
of Non-Suit & Voluntary Dismissal, *Maniar v. Wolf*, No. 18-1362
(RDM) (D.D.C. Aug. 19, 2020), ECF No. 35 at 1.

security and law enforcement interests. Defs.' Ex. C, ECF No. 23-4 at 2. The letter informed Mr. Maniar that he was determined to represent "a threat of engaging in or conducting a violent act of terrorism and [ ] operationally capable of doing so[,]" and stated:

> You are on the U.S. Government's No Fly [L]ist due to, in part, your association and extensive communication with a known extremist located in the United Kingdom who has supported terrorist organizations. The additional details regarding your placement on the U.S. Government's No Fly List cannot be provided to you due to national security concerns.

*Id.* at 2-3; Compl., ECF No. 22 at 7-8 ¶ 40. Despite claiming that this "unclassified summary" did not provide him with "a meaningful [way to] challenge" his designation, Compl., ECF No. 22 at 8 ¶ 41;[12] on December 31, 2018, Mr. Maniar timely filed an administrative appeal with DHS TRIP, which included information contesting the reasons for his No Fly List status as stated in his stage-two letter, *id.* ¶ 43.

While his appeal was pending, in June 2020, Mr. Maniar was pulled over by CBP agents in New Mexico while he was driving from Georgia to California. *Id.* at 9 ¶ 53. Although he only had

---

[12] Mr. Maniar claims that the lack of specific information in his stage-two TRIP letter did "not satisfy the Agency's substantive obligation to disclose sufficient information to allow [him] 'to correct erroneous information in the government's terrorism database.'" Compl., ECF No. 22 at 8 ¶ 42 (quoting *Latif v. Holder*, 28 F. Supp. 3d 1134, 1162-63 (D. Or. 2014)).

a backpack with him, CBP detained him for over an hour, searched him, and fingerprinted him. *Id.* ¶ 54.

On August 18, 2020, DHS TRIP notified Mr. Maniar by letter that he had been removed from the No Fly List "based on the totality of available information, including information [he] provided to DHS TRIP." Defs.' Ex. D, ECF No. 23-5 at 2. The letter also stated that he would "not be placed back on the No Fly List based on currently available information[,]" and that the determination "render[ed his] administrative redress case moot" and therefore closed. *Id.*; Compl., ECF No. 22 at 8 ¶ 44.

### 2. Plaintiff Umaima Shaikh

Ms. Shaikh has familial and religious interests involving travel abroad. *See* Compl., ECF No. 22 at 14 ¶ 99, 15 ¶ 100. First, she has family members residing in Pakistan with whom she was unable to visit for two years as a result of her designation on the No Fly List. *Id.* at 14 ¶ 99. This separation included missing her brother's wedding, her grandmother's funeral, family members' graduations, and visits to sick relatives. *Id.* Second, as a practicing Muslim with sincerely held religious beliefs, Ms. Shaikh has pilgrimage obligations that she claims were hindered by her No-Fly status. *Id.* at 15 ¶ 100. She has traveled to Saudi Arabia for Umrah in the past and hopes to travel there to complete Hajj in the future. *Id.*

Ms. Shaikh recalls being prohibited from traveling via car to Canada with Mr. Maniar on March 15, 2018, *id.* at 11 ¶ 67; and being prohibited from flying for the first time on or before July 3, 2018, *id.* ¶ 68. Ms. Shaikh was scheduled to take an Emirates Airline flight to Pakistan to attend her brother's wedding, but when she arrived at the ticketing counter, airline officials informed her that they could not issue her a boarding pass, nor provide her with a reason why. *Id.* ¶¶ 68-71. As a result, Ms. Shaikh was not able to board her flight and missed her brother's wedding. *Id.* ¶ 72.

On August 13, 2018, Ms. Shaikh initiated a redress inquiry, in which she notified DHS TRIP that her husband, Mr. Maniar, had received an initial determination letter that he was on the No Fly List. *Id.* ¶¶ 74, 77. Four months later, on December 18, 2018, Ms. Shaikh also received an initial determination letter from DHS TRIP informing her that she was on the No Fly List because she was "identified as an individual who 'may be a threat to civil aviation or national security.'" Defs.' Ex. E, ECF No. 23-6 at 2 (quoting 49 U.S.C. § 114(h)(3)(A)). No other information as to the reasons for her No-Fly designation were provided in the letter, although the letter stated that Ms. Shaikh could request additional information regarding her designation within thirty days. *See id.*; Compl., ECF No. 22 at 12 ¶¶ 78-79. On December 26, 2018, Ms. Shaikh's counsel

contacted DHS TRIP to request all relevant information supporting her placement on the No Fly List, including an unclassified summary. Compl., ECF No. 22 at 12 ¶ 81.

On May 14, 2019, Ms. Shaikh filed suit in this Court, seeking to compel DHS TRIP to provide the specific reasons supporting her placement on the No Fly List pursuant to a complaint for declaratory relief under the APA and a Petition for Writ of Mandamus. *Id.* ¶ 82; Compl. & Pet. for Writ of Mandamus, *Shaikh v. McAleenan*, No. 19-1398 (RBW) (D.D.C. May 14, 2019), ECF No. 1 at 7.[13] Nearly nine months later, on February 3, 2020, DHS TRIP issued Ms. Shaikh a stage-two letter providing her with "an unclassified summary that include[d the] reasons supporting [her] placement on the No Fly List." Defs.' Ex. F, ECF No. 23-7 at 2. The letter informed Ms. Shaikh, like Mr. Maniar, that she was determined to represent "a threat of engaging in or conducting a violent act of terrorism and [ ] operationally capable of doing so[,]" and stated:

> You are on the U.S. Government's No Fly List
> due to, in part, your provision of support to
> an individual, made with the knowing purpose
> of furthering the individual's desire to join
> a foreign-based terrorist organization, as
> well as your association and communication

---

[13] This matter was dismissed on March 31, 2020 following Judge Reggie B. Walton's order granting Defendant's Second Motion to Dismiss. *See* Order, *Shaikh v. Wolf*, No. 19-1398 (RBW) (D.D.C. Mar. 31, 2020), ECF No. 16 at 7. Judge Walton determined that Ms. Shaikh's claims "were rendered moot when [DHS TRIP] issued the [stage-two] February 3, 2020 letter to [her]." *Id.* at 5.

> with multiple known extremists. Additional
> reasons for and details regarding your
> placement on the U.S. Government's No Fly List
> cannot be provided to you due to law
> enforcement and national security concerns.

*Id.* at 2-3; Compl., ECF No. 22 at 13 ¶¶ 84-85. Despite claiming

that this "cursory stage-two letter" did not "permit her to make

a meaningful response," Compl., ECF No. 22 at 13 ¶ 86; on March

9, 2020, Ms. Shaikh timely filed an administrative appeal, which

included information contesting the reasons for her No Fly List

status as stated in her stage-two DHS TRIP letter, *id.* ¶ 87.

On July 15, 2020, DHS TRIP notified Ms. Shaikh by letter

that she had been removed from the No Fly List "based on the

totality of available information, including information [she]

provided to DHS TRIP." Defs.' Ex. G, ECF No. 23-8 at 2. The

letter also stated that she would "not be placed back on the No

Fly List based on currently available information[,]" and that

the determination "render[ed her] administrative redress case

moot" and therefore closed. *Id.*; Compl., ECF No. 22 at 13 ¶ 88.

### 3. Events Following Plaintiffs' Removals from the No Fly List

Plaintiffs jointly initiated the instant suit on December

26, 2019, *see* Original Compl., ECF No. 1; but following their

removals from the No Fly List—first Ms. Shaikh on July 15, 2020

(after approximately two years on the list), and then Mr. Maniar

on August 18, 2020 (after approximately three years on the

list)—they have since amended their pleading twice, first on
August 12, 2020, *see* First Am. Compl., ECF No. 19; and again on
September 9, 2020, *see* Second Am. Compl., ECF No. 22. As
Defendants' note, "[t]he allegations in the operative Second
Amended Complaint are materially similar to those in
[Plaintiffs'] original pleading . . . except that [they] now
include [ ] additional allegations concerning certain subsequent
events following their removal[s] from the No Fly List."[14] Defs.'
Mot., ECF No. 23-1 at 25.

As to Ms. Shaikh, she alleges that on July 25, 2020—ten
days after her removal from the No Fly List on July 15, 2020—she
was unable to obtain a boarding pass for her flight from
Raleigh, North Carolina to Atlanta, Georgia without speaking to
a ticketing counter clerk, who in turn had to receive permission
prior to issuing the boarding pass. Compl., ECF No. 22 at 13 ¶¶
89-90. When Ms. Shaikh received her boarding pass, it had an
"SSSS" notation printed on it, which stands for "Secondary
Security Screening Selection." *Id.* at 14 ¶ 91. Ms. Shaikh
alleges that such a notation indicates that she is "still
included within the TSD[S], even though no longer on the No Fly

---

[14] Defendants originally moved to dismiss Plaintiffs' claims on
March 9, 2020, *see* Defs.' Mot. to Dismiss, ECF No. 9 at 1; but
the Court denied that motion as moot after granting Plaintiffs
leave to file their first amended complaint, *see* Minute Order
(Aug. 11, 2020); and thereafter granted them leave to file their
second amended complaint, *see* Minute Order (Aug. 24, 2020).

List" and that her July 2020 travel experience is "consistent with persons on the Selectee List." *Id.* ¶¶ 92-93.

As to Mr. Maniar, he alleges that on August 30, 2020—twelve days after his removal from the No Fly List on August 18, 2020—he traveled to Pakistan to visit family and friends. *Id.* at 8 ¶ 45; Pls.' Opp'n, ECF No. 25 at 12. Upon arrival in Turkey for his connecting flight, Mr. Maniar was subjected to "extensive individualized questioning" before being allowed to board his next flight to Pakistan. Compl., ECF No. 22 at 8 ¶ 46. When he landed in Pakistan, Mr. Maniar was detained by Pakistani authorities and again questioned extensively. *Id.* at 9 ¶ 47. Although he was released, Mr. Maniar was not permitted to remain in Pakistan and was forced to immediately book travel back to the U.S. *Id.* Mr. Maniar alleges that such events indicate that he "is still included within the TSD[S], even though no longer on the No Fly List" and that his August 2020 travel experience is "consistent with persons on the Selectee List[,]" which is "communicat[ed ] to other nations." *Id.* ¶¶ 47-49.

Plaintiffs additionally allege that they have both separately learned that FBI agents have asked people they personally know questions about them, during which the agents "strongly impl[ied] that [Plaintiffs have] criminal and/or nefarious intentions and/or contacts." *Id.* at 10 ¶ 57, 14 ¶ 95. Both Plaintiffs claim the actions of these FBI agents damaged

their reputations and violated their privacy interests, *id.* at 10 ¶ 59, 14 ¶ 97; as well as caused them "extreme emotional distress, as a result of the stigmatization created by [ ] Defendants' actions[,]" *id.* at 10 ¶ 60, 14 ¶ 98; *see also id.* at 9 ¶ 55 (stating Mr. Maniar's belief that he found helicopters hovering above his house and has been followed on more than one occasion subsequent to his placement on the No Fly List).

Plaintiffs claim that their "former designation on the No Fly List, believed current placement on the Selectee List, and substantial likelihood that [they] could again be placed on the No Fly List, infringe on [their] religious exercise," *id.* at 10 ¶ 61, 15 ¶ 100; in addition to prior and ongoing "infringements on [their] chosen employment [and ability to travel], reputational damage, [ ] emotional distress[,]" and family separation, *id.* at 9 ¶ 50, 14 ¶ 94, 16 ¶ 110; *see also id.* at 3 ("These ongoing travel difficulties, and the risk of repetition for [Plaintiffs] to again be placed on the No Fly List, result in infringements upon their constitutional rights and protected interests."); Pls.' Opp'n, ECF No. 25 at 12 (alleging "ongoing" harm due to the "continuing heightened scrutiny" of Plaintiffs during travel and the sharing of their TSDS placement with foreign governments). They bring the following claims in "challenging the constitutionality and adequacy of Defendants' policies and actions," Pls.' Opp'n, ECF No. 25 at 7: (1)

violations of their Fifth Amendment procedural and substantive due process rights against all Defendants (Counts One and Two, respectively); (2) violations of the APA due to alleged inadequacies in the DHS TRIP redress process against Defendants Alejandro Mayorkas (DHS) and David Pekoske (TSA) (Count Three); (3) violations of their First Amendment rights against all Defendants (Count Four); and (4) entitlement to attorney's fees and costs under the Equal Access to Justice Act ("EAJA"), as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412 (Count Five), *see* Compl., ECF No. 22 at 17-25.

Plaintiffs seek declaratory and injunctive relief. *See id.* at 25-26. First, they ask the Court to declare that Defendants violated and continue to violate their rights under the U.S. Constitution. *See id.* at 25. Second, they ask the Court to declare that Defendants' actions against them "constitute an abuse of discretion" and are "arbitrary and capricious" in violation of the APA. *See id.* at 25-26. Third, they ask the Court to order DHS TRIP "to provide persons with meaningful opportunities to challenge future inclusion on the No Fly List moving forward[.]" *Id.* at 26. Finally, they seek attorney's fees and costs and any additional relief the Court deems proper. *Id.*

On September 28, 2020, Defendants moved to dismiss Plaintiff's Second Amended Complaint for lack of subject-matter jurisdiction and failure to state a claim. *See* Defs.' Mot., ECF

No. 23 at 1 (citing Fed. R. Civ. P. 12(b)(1), (b)(6)). In support of that motion, Defendants filed accompanying Exhibits A through G, of which the Court takes judicial notice. *See supra* note 3. Plaintiffs filed their opposition brief on October 19, 2020, *see* Pls.' Opp'n, ECF No. 25; to which Defendants replied on November 2, 2020, *see* Defs.' Reply, ECF No. 26. On September 28, 2022, Plaintiffs filed a Notice of Supplemental Authority to bring to the Court's attention "the recently issued decision[s] of *Fikre v. FBI*, 35 F.4th 762 (9th Cir. 2022)" and *Long v. Pekoske*, 38 F.4th 417 (4th Cir. 2022), which they claim "bear[] directly on the facts of this case." *See* Pls.' Notice of Suppl. Authority ("Pls.' Suppl. Notice"), ECF No. 29 at 1. Defendants responded to this notice on October 16, 2022, claiming that "neither case aids [Plaintiffs'] claims in this action." *See* Defs.' Resp. to Pls.' Notice of Suppl. Authority ("Defs.' Suppl. Resp."), ECF No. 30 at 1. Defendants' Renewed Motion to Dismiss is now ripe and ready for the Court's adjudication.

### III. Legal Standard

#### A. Rule 12(b)(1)—Subject-Matter Jurisdiction

"A federal district court may only hear a claim over which [it] has subject-matter jurisdiction; therefore, a Rule 12(b)(1) motion for dismissal is a threshold challenge to a court's jurisdiction." *Gregorio v. Hoover*, 238 F. Supp. 3d 37, 44 (D.D.C. 2017) (citation omitted). To survive a Rule 12(b)(1)

motion, the plaintiff bears the burden of establishing that the court has jurisdiction by a preponderance of the evidence. *Moran v. U.S. Capitol Police Bd.*, 820 F. Supp. 2d 48, 53 (D.D.C. 2011) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)). "Because Rule 12(b)(1) concerns a court's ability to hear a particular claim, the court must scrutinize the plaintiff's allegations more closely when considering a motion to dismiss pursuant to Rule 12(b)(1) than it would under a motion to dismiss pursuant to Rule 12(b)(6)." *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 65 (D.D.C. 2011). In so doing, the court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, but the court need not "accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations." *Rann v. Chao*, 154 F. Supp. 2d 61, 64 (D.D.C. 2001).

In reviewing a motion to dismiss pursuant to Rule 12(b)(1), "the court need not limit itself to the allegations of the complaint." *Id.* (citing *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64, 107 S. Ct. 2246, 96 L. Ed. 2d 51 (1987)). Rather, the court "may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction to hear the case." *Scolaro v. Dist. of Columbia Bd. of Elections*

& *Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000); *see also Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005). "Faced with motions to dismiss under Rule 12(b)(1) and Rule 12(b)(6), a court should first consider the Rule 12(b)(1) motion because [o]nce a court determines that it lacks subject matter jurisdiction, it can proceed no further." *Ctr. for Biological Diversity v. Jackson*, 815 F. Supp. 2d 85, 90 (D.D.C. 2011) (citations and internal quotation marks omitted).

### 1. Article III Standing

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157, 134 S. Ct. 2334, 189 L. Ed. 2d 246 (2014) (quoting U.S. Const. art. III, § 2). "'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408, 133 S. Ct. 1138, 185 L. Ed. 2d 264 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 818, 117 S. Ct. 2312, 138 L. Ed. 2d 849 (1997)); *see Lujan*, 504 U.S. at 560 (calling standing "the irreducible constitutional minimum"); *see also Jibril III*, 2023 WL 2240271, at *4 ("[A] court might lack subject-matter jurisdiction [ ] if a plaintiff lacks Article III standing." (citing *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987))). The law of Article III standing "is built on separation-of-powers principles" and "serves to prevent the

judicial process from being used to usurp the powers of the political branches." *Clapper*, 568 U.S. at 408.

To establish standing, "a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List*, 573 U.S. at 157-58 (quoting *Lujan*, 504 U.S. at 560-61); *see also Hollingsworth v. Perry*, 570 U.S. 693, 705, 133 S. Ct. 2652, 186 L. Ed. 2d 768 (2013) ("To have standing, a litigant must seek relief for an injury that affects him [or her] in a personal and individual way[, *i.e.*,] . . . possess[ing] a direct stake in the outcome of the case." (citations and internal quotation marks omitted)). The plaintiff, as "[t]he party invoking federal jurisdiction[,] bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561. "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.*; *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208, 210 L. Ed. 2d. 568 (2021) ("[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing

for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages).").

At the pleading stage, plaintiffs need only "'state a *plausible* claim' that each of the standing elements is present." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 625-26 (D.C. Cir. 2017) (citation omitted); *see also Kareem v. Haspel*, 986 F.3d 859, 866 (D.C. Cir. 2021) ("[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim [of standing] that is plausible on its face.'" (citation omitted)). The court "assume[s], for purposes of the standing analysis, that plaintiffs will prevail on the merits of their claim[s,]" *Attias*, 865 F.3d at 629; but it "must dismiss the case pursuant to Rule 12(b)(1)" if plaintiffs fail to prove that they have standing, *Jibril v. Wolf*, No. 1:19-cv-2457 (RCL), 2020 WL 2331870, at *3 (D.D.C. May 9, 2020), *aff'd in part, rev'd in part & remanded*, *Jibril v. Mayorkas*, 20 F.4th 804 (D.C. Cir. 2021) [hereinafter "*Jibril II*"].

## IV. Analysis

Defendants move to dismiss Plaintiffs' operative complaint on the ground that Plaintiffs lack standing to pursue any of their claims, and thus the Court lacks subject-matter jurisdiction. *See* Defs.' Mot., ECF No. 23-1 at 27-31. Specifically, Defendants claim that Plaintiffs' "injury theory" rests on speculation and does not establish "certainly

27

impending" harm sufficient to confer standing since they "seek prospective relief for a number of alleged injuries associated with the No Fly List . . . [b]ut [ ] are no longer on the No Fly List[.]" *Id.* at 14-15. Plaintiffs argue that they have standing, despite their removals from the No Fly List, due to ongoing religious infringements and reputational, employment, and emotional harms resulting from their former No-Fly status, along with continued impacts to their ability to travel from their "believed current placement on the Selectee List," and because of a "substantial likelihood [they] could again be placed on the No Fly List[.]" *See* Pls.' Opp'n, ECF No. 25 at 15-17; Compl., ECF No. 22 at 9 ¶ 50, 10 ¶ 61, 14 ¶ 94, 15 ¶ 100, 16 ¶ 110. Moreover, Plaintiffs proffer arguments as to why their claims under the First and Fifth Amendments, APA, and EAJA should proceed to the merits. *See* Pls.' Opp'n, ECF No. 25 at 21-35.

Because "[a] federal district court may only hear a claim over which [it] has subject-matter jurisdiction[,]" *Gregorio*, 238 F. Supp. 3d at 44; the Court first turns to the parties' jurisdictional arguments before determining whether "it can proceed [ ] further" to the merits of Plaintiffs' constitutional and statutory claims, *Jackson*, 815 F. Supp. 2d at 90.

### A. Plaintiffs Lack Standing to Pursue Any of Their Claims

Plaintiffs bear the burden of establishing that they "have (1) suffered an injury in fact, (2) that is fairly traceable to

the challenged conduct of [Defendants], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016) (citing *Lujan*, 504 U.S. at 560-61). Here, Plaintiffs' case for declaratory and injunctive relief "primarily concerns injury in fact, the '[f]irst and foremost' of standing's three elements." *Id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998)); *Susan B. Anthony List*, 573 U.S. at 158 ("This case concerns the injury-in-fact requirement, which helps to ensure that [Plaintiffs have] a personal stake in the outcome of the controversy." (citation and internal quotation marks omitted)).

To establish injury in fact, Plaintiffs must show that they suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks omitted); *see also Spokeo*, 578 U.S. at 339-40 (defining a "particularized" injury as one that "affect[s] the plaintiff in a personal and individual way" and a "concrete" injury as a "real, and not abstract" injury that "must actually exist" (internal quotation marks omitted)); *Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 820 (D.C. Cir. 2006) ("Article III does not require actual harm. . . . [I]mminent harm will suffice."). "Although imminence is concededly a

somewhat elastic concept," *Clapper*, 568 U.S. at 409; for claims seeking prospective relief, like those alleged by Plaintiffs, "[a]n allegation of future injury may suffice [as imminent] if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur[,]" *Susan B. Anthony List*, 573 U.S. at 158 (citation omitted); *Clapper*, 568 U.S. at 409 (distinguishing between threatened injury that is "*certainly impending*," which constitutes injury in fact, and "[a]llegations of *possible* future injury," which are insufficient); *see also TransUnion*, 141 S. Ct. at 2210 ("[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." (citing *Clapper*, 568 U.S. at 414 n.5; *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983))).

Although a plaintiff seeking prospective relief "may not rest on past injury" alone to establish standing, *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015); *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011); "[p]ast wrongs may serve as evidence bearing on whether there is a real and immediate threat of repeated injury," *Jibril II*, 20 F.4th at 814 (citations and internal quotation marks omitted). Moreover, past exposure to illegal conduct, when accompanied by "any continuing, present adverse effects," may suffice to support Article III standing in

a case or controversy regarding declaratory and injunctive
relief. *O'Shea v. Littleton*, 414 U.S. 488, 495-96, 94 S. Ct.
669, 38 L. Ed. 2d 674 (1974); *see also Dearth*, 641 F.3d at 501
(requiring plaintiffs to show they are suffering from "an
ongoing injury or face[] an immediate threat of injury").

In addition, at the motion to dismiss stage, Plaintiffs
must state a plausible claim that any alleged injury in fact is
"'fairly traceable to the actions of [Defendants, and] is likely
to be redressed by a favorable decision on the merits.'" *Taylor
v. FAA*, 351 F. Supp. 3d 97, 101 (D.D.C. 2018) (quoting *Food &
Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir.
2015)). Causation and redressability "'are closely related' like
'two sides of a . . . coin.'" *West v. Lynch*, 845 F.3d 1228, 1235
(D.C. Cir. 2017) (quoting *Dynalantic Corp. v. Dep't of Def.*, 115
F.3d 1012, 1017 (D.C. Cir. 1997)). "Like heads and tails,
however, the two concepts are distinct: causation focuses on the
'connection between the assertedly unlawful conduct and the
alleged injury' whereas redressability focuses on the
'connection between the alleged injury and the judicial relief
requested.'" *Id.* at 1235-36 (quoting *Allen v. Wright*, 468 U.S.
737, 753 n.19, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984)).

Given the constitutional import of standing, the Court
delineates in detail the parties' opposing arguments. First,
Defendants argue that "Plaintiffs do not have standing to obtain

31

prospective relief with respect to their prior No Fly List placement" because they cannot establish a "certainly impending" injury. Defs.' Mot., ECF No. 23-1 at 15, 28. The government identifies, from the Second Amended Complaint, "a number of [Plaintiffs'] alleged injuries associated with the No Fly List," such as: (1) an alleged inability to travel, including for religious or professional reasons; and (2) alleged reputational or emotional impacts. *Id.* at 14-15, 28. However, at the time they filed the operative complaint, Plaintiffs were "no longer on the No Fly List," so the government argues that they cannot now proffer allegations of harm "due to any *ongoing* placement" on the list, nor allegations that "they are *currently* unable to travel[,]" as both have traveled recently. *Id.* at 15, 28 (emphases added). Instead, to the extent Plaintiffs rely on *past* emotional, reputational, or travel impacts, the government argues that "their requested, *prospective* relief [ ] cannot redress th[o]se harms." *Id.* at 28; *see also* Defs.' Reply, ECF No. 26 at 10 ("[B]ecause Plaintiffs have been removed from the No Fly List, any declaration or injunction regarding the lawfulness of that list . . . could have no immediate . . . consequences for [them.]"). Also, to the extent "Plaintiffs' injury theory" rests on the assertion that they "may again be restored on the [No Fly] list, despite DHS's assurance that they will *not* be placed back on the list based on currently available

information[,]" Defs.' Mot., ECF No. 23-1 at 15; *see also* Defs.'
Ex. D, ECF No. 23-5 at 2; Defs.' Ex. G, ECF No. 23-8 at 2;
Defendants argue that such a "speculative" theory "'does nothing
to establish a real and immediate threat that [they] [will]
again' be placed on the No Fly List[,]" *id.* at 15, 25, 29
(quoting *Lyons*, 461 U.S. at 105); *see also* Defs.' Reply, ECF No.
26 at 11 ("[A]ny risk of a future re-designation is . . .
'hypothetical[.]'"). In other words, Defendants claim that
"Plaintiffs are unable to demonstrate an injury in fact at this
time" in relation to their *former* placement on the No Fly List.
*Id.* at 15, 25; Pls.' Opp'n, ECF No. 25 at 14.

Second, the government argues that Plaintiffs also cannot
establish standing as to their Selectee List claims, as "the
Second Amend[ed] Complaint does not bring [well-pled] claims
that *challenge* [their] alleged Selectee List placement, and in
any event could not allege that placement on the Selectee List
will result in harms equivalent [to those] associated with the
No Fly List[.]" *See* Defs.' Mot., ECF No. 23-1 at 15, 25, 30
("Plaintiffs also allege that they may be on another, less
restrictive watch list, thus creating the risk of future delays
and additional screening at airports[, b]ut there is no
allegation that [they] will necessarily suffer these injuries
when traveling in the future."). Finally, Defendants argue that
standing, not mootness, "is the proper jurisdictional framework"

for evaluating Plaintiffs' No Fly and Selectee List claims since they filed the Second Amended Complaint after being removed from the No Fly List, and the Court "must measure standing" as of the date of that complaint. *Id.* at 27 n.5-28.

Plaintiffs contend that Defendants' arguments regarding standing "ignore[] important factual realities[,]" as they allege that their "harm did not cease at the time of their removals from the No Fly List[.]" Pls.' Opp'n, ECF No. at 25 at 14-15. They argue that they continue to suffer from "extreme emotional distress" because of prior periods of family separation and hindrances to chosen employment ventures while they were on the No Fly List, along with "the stigmatization created by [ ] Defendants' actions[,]" none of which "evaporate[d] upon removal from the" list. *Id.* at 15. Plaintiffs also allege concrete injury in the form of continued impacts to their ability to travel, namely the potential for "severe" and "extensive" questioning and detention abroad, like what Mr. Maniar experienced in Turkey and Pakistan, and "extensive screening" in the U.S. *Id.* at 15-16. Plaintiffs thus allege that they have standing because "[a]s pled in [their] Amended Complaint, . . . these actions occurred due to [ ] Defendants['] placement of [them] on the No Fly List and Selectee List, and communication of that placement to other nations[,]" which have caused them "particularized" and "ongoing" harms. *Id.* at 16-17.

Although Plaintiffs concede they are no longer on the No Fly List, they furthermore allege harm due to "the very real possibility of recurrence of [ ] injury[,]" namely redesignation to the No Fly List. *Id.* at 17. They argue that this potential harm is "capable of redress only by a ruling ordering DHS TRIP to revise [its] procedures to provide [them] with an ability to meaningfully challenge future likely inclusions on the No Fly List[.]" *Id.; see also* Compl., ECF No. 22 at 26.

As an initial matter, the Court adopts the government's (uncontested) argument that "standing, rather than mootness, is the proper jurisdictional framework." Defs.' Mot., ECF No. 23-1 at 27 n.5. Whereas standing mandates that "[t]he requisite personal interest . . . exist at the commencement of the litigation[,]" mootness "has been described as . . . standing set in a time frame[,]" requiring that the personal stake continue throughout the duration of the litigation. *Arizonans for Off. English v. Arizona*, 520 U.S. 43, 68 n.22, 117 S. Ct. 1055, 137 L. Ed. 2d 170 (1997) (citations and internal quotation marks omitted). A case becomes moot, mandating dismissal, "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91, 133 S. Ct. 721, 184 L. Ed. 2d 553 (2013) (citation omitted); *see also Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) ("Even where litigation poses a

live controversy when filed, the [mootness] doctrine requires a federal court to refrain from deciding it if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." (citation and internal quotation marks omitted)); *Long*, 38 F.4th at 423 (defining mootness as "[a] change in factual circumstances[,] . . . such as when the plaintiff receives the relief sought"). While plaintiffs bear the burden of establishing standing, *see Lujan*, 504 U.S. at 561; defendants bear the "heavy" burden of establishing "that a once-live case has become moot[,]" *West Virginia v. EPA*, 142 S. Ct. 2587, 2607, 213 L. Ed. 2d 896 (2022); *see also Zukerman v. USPS*, 961 F.3d 431, 442 (D.C. Cir. 2020) ("[T]he party urging mootness bears a heavy burden.").

"[T]here are important exceptions to the mootness doctrine that distinguish it from standing." *Nat. L. Party of the U.S. v. FEC*, 111 F. Supp. 2d 33, 40 (D.D.C. 2000). One such exception is the voluntary cessation doctrine, which "disfavors dismissal of claims a defendant purposely 'moots' when such dismissal would leave the defendant 'free to return to his old ways.'" *Hinton v. Dist. of Columbia*, 567 F. Supp. 3d 30, 43 (D.D.C. 2021) (citation omitted). To protect against this unfair outcome, the doctrine "prohibits courts from conclud[ing] that a defendant's voluntary cessation of disputed conduct renders a case moot

36

unless the party urging mootness demonstrates that (1) there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely or irrevocably eradicated the effects of the alleged violation." *Id.* (citation and internal quotation marks omitted); *see also Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 190, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000) ("[A] defendant claiming that its voluntary compliance moots a case bears a formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."). Another exception to mootness is the "capable of repetition yet evading review" doctrine, requiring a plaintiff to demonstrate that "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 322 (D.C. Cir. 2009) (citation omitted); *see also Clarke*, 915 F.2d at 704 (requiring proof as to both prongs to "fit [a] case into one of the 'exceptional situations' to which this doctrine applies").[15]

---

[15] Defendants note that "Plaintiffs appear to reference the 'capable of repetition yet evading review' mootness exception[.]" Defs.' Mot., ECF No. 23-1 at 29 n.6; *see* Pls.' Opp'n, ECF No. 25 at 17 (arguing that Defendants can "escape

In this case, the Court need not address the issue of
whether Plaintiffs' removals from the No Fly List have possibly
mooted their case, since Defendants argue for dismissal solely
on the basis that Plaintiffs lack standing, and Plaintiffs
proffer no arguments in opposition that the burden should shift
to the government to prove mootness.[16] *See Nat. L. Party*, 111 F.
Supp. 2d at 41; *see also Friends of the Earth*, 528 U.S. at 180
(addressing the question of standing before determining whether

---

review" in this and future lawsuits "by removing Plaintiffs from
the No Fly List for the time being"). Because the Court is
persuaded that standing, not mootness, "is the proper
jurisdictional framework," Defs.' Mot., ECF No. 23-1 at 27 n.5;
to the extent Plaintiffs' Opposition seeks to apply this
mootness exception, the Court rejects that attempt.
[16] The Court notes Plaintiffs' Notice of Supplemental Authority,
which brings to the Court's attention "the recently issued
decision[s] of *Fikre v. FBI*, 35 F.4th 762 (9th Cir. 2022)" and
*Long v. Pekoske*, 38 F.4th 417 (4th Cir. 2022), which they claim
"bear[] directly on the facts of this case." Pls.' Suppl.
Notice, ECF No. 29 at 1. However, the Court's review of these
cases, which concern the "application of the voluntary cessation
exception to mootness to a[ government] affidavit promising that
a plaintiff would not be added back to a TSDS watchlist[,]"
indicates that they do "not provide a helpful analog." *Jibril
III*, No. 1:19-cv-2457 (RCL), 2023 WL 2240271, at *7 n.2 (D.D.C.
Feb. 27, 2023). "Unlike in those cases," where mootness was the
"proper framework," under the standing analysis, it is not
"incumbent on the government to make 'absolutely clear that the
allegedly wrongful behavior' of returning [Plaintiffs] to a
watchlist 'could not reasonably be expected to recur.'" *Id.*
(quoting *West Virginia v. EPA*, 142 S. Ct. 2587, 2607, 213 L. Ed.
2d 896 (2022)). Defendants made the same argument in their
response to Plaintiffs' supplemental notice. *See* Defs.' Suppl.
Resp., ECF No. 30 at 1-2 (arguing that neither *Fikre* nor *Long*
"aids [Plaintiffs'] claims in this action[,]" as "the 'voluntary
cessation' exception to mootness has no analogue relevant to the
standing question presented by Defendants' motion").

to turn to mootness). While standing is generally determined at
the time the suit is initiated, *Nat. L. Party*, 111 F. Supp. 2d
at 41; "when a plaintiff files a complaint in federal court and
then voluntarily amends the complaint, courts look to the
amended complaint to determine jurisdiction[,]" *Rockwell Int'l
Corp. v. United States*, 549 U.S. 457, 473-74, 127 S. Ct. 1397,
167 L. Ed. 2d 190 (2007); *see also Cnty. Of Riverside v.
McLaughlin*, 500 U.S. 44, 51, 111 S. Ct. 1661, 114 L. Ed. 2d 49
(1991) (assessing standing "at the time the second amended
complaint was filed"); *Feinman v. CIA*, No. 08-2188 (EGS), 2009
WL 10692650, at *3 n.4 (D.D.C. Aug. 6, 2009) ("Because subject
matter jurisdiction must be evaluated at the time the action was
brought, this Court must evaluate standing from the time the
motion for leave to amend the complaint was filed."); *G&E Real
Estate, Inc. v. Avison Young-Washington, D.C., LLC*, 168 F. Supp.
3d 147, 159-60 (D.D.C. 2016) (requiring courts to "measure
standing by the state of the world as of the date of . . . a
supplemental or amended complaint"). Here, Ms. Shaikh and Mr.
Maniar were removed from the No Fly List on July 15, 2020 and
August 18, 2020, respectively, Defs.' Reply, ECF No. 26 at 8;
and thereafter filed their Second Amended Complaint on September
9, 2020, *see* Compl., ECF No. 22. Therefore, the relevant
question is whether they had "[t]he requisite personal interest"
to establish standing as of "the state of the world" on

September 9, 2020. *Arizonans*, 520 U.S. at 68 n.22; *G&E Real Estate*, 168 F. Supp. 3d at 159.

Given the parties' above arguments as to standing and Plaintiffs' burden to establish standing "for each claim" they are pursuing and "for each form of relief" they are seeking, *see Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439, 137 S. Ct. 1645, 198 L. Ed. 2d 64 (2017) (collecting U.S. Supreme Court cases "mak[ing it] clear that 'standing is not dispensed in gross'"); the Court separately evaluates standing for Plaintiffs' claims first as to the No Fly List, and second as to the Selectee List. For the reasons detailed below, the Court concludes that Plaintiffs have failed to establish standing to pursue both their No Fly and Selectee List claims.

### 1. Plaintiffs Have Failed to Establish Standing to Pursue Their No Fly List Claims

Presuming the truth of the allegations in Plaintiffs' complaint and drawing all reasonable inferences in their favor, *Rann*, 154 F. Supp. 2d at 64; the Court concludes that Plaintiffs lack standing to pursue their No Fly List claims because both were removed from that list as of the date of the Second Amended Complaint, such that "any declaration or injunction regarding the lawfulness of that list, their alleged prior status on it, and/or the procedures that they were afforded to challenge the same, could have no immediate or real-world consequences for"

40

them, *i.e.*, "nothing concrete remains at stake in their claims[,]" Defs.' Reply. ECF No. 26 at 10. Because Plaintiffs seek prospective relief as to their No Fly List claims, *see* Compl., ECF No. 22 at 25-26; they cannot rely on "past injuries alone" to establish standing, *Dearth*, 641 F.3d at 501; rather, they must "establish an ongoing or future injury that is 'certainly impending[,]'" *Williams v. Lew*, 819 F.3d 466, 472 (D.C. Cir. 2016) (quoting *Arpaio*, 797 F.3d at 19). But, by continuing to advance claims based on their *former* No Fly List designations, Plaintiffs fail to allege any "ongoing" injury, as "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *O'Shea*, 414 U.S. at 496-96; *see also* Defs.' Mot., ECF No. 23-1 at 15, 28 (arguing that there can be no reputational or emotional impacts to Plaintiffs due to "ongoing placement on the No Fly List," nor allegations that they are "currently unable to travel" because of that list); Defs.' Reply, ECF No. 26 at 10 ("Simply put, the No Fly List no longer prevents either Plaintiff from boarding flights, and can by no means be said to present any 'certainly impending' injury to either of them." (quoting *Clapper*, 568 U.S. at 401)). Recent cases considering standing following a person's removal from a TSDS watchlist have reached the same conclusion. *See, e.g.*, *Jibril III*, 2023 WL

41

2240271, at *6 (concluding that subsequent removal from a TSDS
list after initiating a DHS TRIP inquiry but prior to the filing
of a complaint causes plaintiffs to "lack standing to seek
prospective relief because they could not demonstrate a
substantial risk of future injury"); *Nur v. Unknown CBP
Officers*, No. 1:22-cv-169, 2022 WL 16747284, at *8 (E.D. Va.
Nov. 7, 2022) (concluding that a plaintiff would lack standing
if "he was once on [a TSDS] watchlist but has since been
removed, as he does not face a 'real and immediate' threat of
injury"); *Scherfen v. DHS*, No. 3:CV-08-1554, 2010 WL 456784, at
*8 (M.D. Pa. Feb. 2, 2010) (concluding that plaintiffs who were
in the TSDS "at one time, but have since been removed" would
lack standing because their removal "would deprive [the c]ourt
of the requisite 'live controversy'" and would make the court
"unable to grant effective relief"); *see also Feinman*, 2009 WL
10692650, at *4-5 (concluding that the plaintiff lacked standing
to challenge an FBI policy or practice "at the time she sought
leave to amend her complaint" because "the injury she had
allegedly sustained no longer existed").[17]

---

[17] Defendants direct the Court to cases dismissing "analogous
claims for lack of subject-matter jurisdiction, following the
plaintiff's removal from the No Fly List." *See* Defs.' Reply, ECF
No. 26 at 10; Defs.' Mot., ECF No. 23-1 at 28-29. The Court does
not regard these cases as directly on point because they pertain
to dismissal based on mootness rather than standing, but to the
extent they support the Court's conclusion that a plaintiff's
claims are no longer justiciable following removal from a TSDS

Although Plaintiffs claim that they continue to suffer from "extreme emotional distress" and "stigmatization created by [ ] Defendants' actions[,]" which "did not cease at the time of their removals from the No Fly List," Pls.' Opp'n, ECF No. 25 at

_____

watchlist, the Court cites them here. *See, e.g.*, *Bosnic v. Wray*, No. 3:17-cv-826, 2018 WL 3651382, at *4-5 (M.D. Fla. July 10, 2018) (recommending dismissal based on the conclusion "that the relief sought by Plaintiff with respect to the No Fly List—injunctive or declaratory—no longer 'remains viable, and without any tenable claim to redress, the case [with respect to the No Fly List] has become moot'" where "DHS TRIP affirmatively informed Plaintiff that he had been removed from" that list), *report and recommendation adopted*, No. 3:17-cv-826 (Aug. 1, 2018), ECF No. 32 at 1-2; *Scherfen v. DHS*, No. 3:CV-08-1554, 2010 WL 456784, at *9 (M.D. Pa. Feb. 2, 2010) (concluding that under both the standing and mootness doctrines, plaintiffs who are removed from the TSDS "cannot maintain" their actions because no meaningful injunctive relief could be granted without the existence of the requisite "legally cognizable interest[s]"); *Mokdad v. Sessions*, 876 F.3d 167, 170 (6th Cir. 2017) ("When TSC agreed to stipulate that [Plaintiff] was not on the No Fly List and would not be put on the list based on current information, . . . there was no live case or controversy, and the district court properly dismissed [his] claim for lack of subject matter jurisdiction."); *see also* Defs.' Reply, ECF No. 26 at 10 (collecting cases from other contexts that were dismissed on mootness grounds following the plaintiffs' removals from the lists or designations at issue). Thus, even if the Court were to assume Plaintiffs have standing and move on to analyzing their subsequent removals from the No Fly List under the mootness doctrine, *see Arizonans for Off. English v. Arizona*, 520 U.S. 43, 66-67, 117 S. Ct. 1055, 137 L. Ed. 2d 170 (1997) (assuming, *arguendo*, that the plaintiffs had standing to analyze the mootness issue); these cases indicate that their No Fly List claims would still fail, *Scherfen*, 2010 WL 456784, at *8-9; *see also Long*, 38 F.4th at 423 (concluding "that Long's claims challenging his No-Fly status [were] moot" following his removal from that list); *Kovac v. Wray*, 449 F. Supp. 3d 649, 655 (N.D. Tex. 2020) (finding that the plaintiff's removal from the No Fly List was a "change in circumstances" that mooted those particular claims).

15; however true that may be, the Court is persuaded by existing caselaw that such "residual" feelings, *id.* at 17; do not amount to "actual" or "concrete" injury in fact, *Lujan*, 504 U.S. at 560; *see also Jibril III*, 2023 WL 2240271, at *7 ("Even if the interests cited by the Jibrils amount to constitutionally protected liberty interests[, including travel, religious, and reputational interests], the alleged injuries to those interests would be ongoing only if the Jibrils were in fact *currently on* the Selectee List." (emphasis added)). Moreover, the harms Plaintiffs allegedly experienced because of their placement on the No Fly List, including "family separation" from relatives abroad and hindrances to Mr. Maniar's "chosen employment and business ventures[,]" Pls.' Opp'n, ECF No. 25 at 15; are not "ongoing" but "past" injuries, for which they may not now seek declaratory and injunctive relief, *see Arpaio*, 797 F.3d at 19.

"[I]t is equally insufficient for a plaintiff claiming standing to observe that the challenged conduct is repeatable in the future." *See Lebron v. Rumsfeld*, 670 F.3d 540, 561 (4th Cir. 2012) ("The Supreme Court has repeatedly rejected such a basis for standing." (citing *Golden v. Zwickler*, 394 U.S. 103, 109, 89 S. Ct. 956, 22 L. Ed. 2d 113 (1969))). Yet, Plaintiffs argue that "the power to decide whether to place them back on the No Fly List . . . rests entirely and exclusively in the hands of Defendants with no meaningful way for Plaintiffs to challenge

the underlying data[,]" and that the "threat of recurring harm continue[s]" because they have "no assurance that they will not again be placed on the No Fly List[.]" Pls.' Opp'n, ECF No. 25 at 15, 17. Although DHS TRIP told both Plaintiffs, in their letters informing them of their removals from the No Fly List, that they "no longer satisfy the criteria for placement" on that list "based on currently available information[,]" Defs.' Ex. D, ECF No. 23-5 at 2, & Ex. G, ECF No. 23-8 at 2; Plaintiffs argue that this "explicit language . . . leaves open the possibility for recurrence[,]" Pls.' Opp'n, ECF No. 25 at 17. The government responds that "any risk of a future re-designation is the very definition of an entirely 'conjectural' or 'hypothetical' alleged harm that cannot support Article III standing." Defs.' Reply, ECF No. 26 at 11. The Court agrees.

To establish standing based on an "imminent" injury in fact, Plaintiffs must allege that the threatened injury—redesignation to the No Fly List—is not merely "*possible*" but "*certainly impending*" or has a "substantial risk" of occurrence. *Clapper*, 568 U.S. at 409, 414 n.5 (emphasis in original); *TransUnion*, 141 S. Ct. at 2210 (requiring future injury for purposes of prospective relief to be "sufficiently imminent and substantial"). However, when "the prospect of future injury rest[s] on the likelihood that [Plaintiffs] will again be" redesignated to the No Fly List, "[t]he most that can be said

for [their] standing" is that *if* they are redesignated to the No Fly List, they will again be subjected to the subsequent discriminatory harms alleged in their complaint. *See Lyons*, 461 U.S. at 102-03 (internal quotation marks omitted). However, the Court cannot "find a case or controversy in those circumstances: the threat to [Plaintiffs is] not sufficiently real and immediate to show an existing controversy simply because they anticipate" redesignation to the No Fly List. *Id.* at 103 (citation and internal quotation marks omitted); *O'Shea*, 414 U.S. at 497 ("attempting to anticipate whether and when" a future injury will recur is "speculation and conjecture"); *Golden*, 394 U.S. at 109 (stating that prior events are "hardly a substitute for evidence . . . of 'immediacy and reality'"); *see also Lebron*, 670 F.3d at 560-61 (concluding that a plaintiff, who was formerly designated and detained as an enemy combatant, lacked standing to pursue declaratory relief when his prior designation "prove[d] no more than . . . a possibility that [he] could be redesignated as an enemy combatant" in the future); *Feinman*, 2009 WL 10692650, at *4 ("[T]here is simply nothing in the record the Court could rely on—aside from 'unadorned speculation'—to conclude that Plaintiff [ ] is likely to be subjected to the FBI's alleged policy or practice again.").

Moreover, both Plaintiffs have received confirmation from the government that they will "not be placed back on the No Fly

List based on currently available information[,]" Defs.' Ex. D,
ECF No. 23-5 at 2, & Ex. G, ECF No. 23-8 at 2; which leads to
the inference that the same information that led to their
original designations, "without more, cannot be used to re-
nominate either of them to th[at l]ist," Defs.' Reply, ECF No.
26 at 11; or create an "'immediate threat that [they] [will]
again' be placed on the No Fly List[,]" Defs.' Mot., ECF No. 23-
1 at 29. Another Judge in this District reached a similar
conclusion in *Jibril III*, when he determined that the plaintiffs
in that case could not establish standing based on hypothetical
future redesignation to the Selectee List:

> [I]f the government satisfied the Court with
> an affidavit given under penalty of perjury
> that it would not add Mohammed Jibril back to
> the Selectee List *unless new information
> provided a reason for doing so*, any
> apprehension that the Jibrils might be
> subjected to similar enhanced screening
> measures on a future trip . . . or have any
> reason to make further attempts to contest
> their potential watchlist status . . . , would
> depend on the *hypothetical possibility that
> the government might receive new information
> in the future* convincing it that Mohammed
> Jibril once again met the criteria for
> inclusion on the Selectee List. Without a way
> of demonstrating that 'a threatened inquiry
> [was] certainly impending or there [was] a
> substantial risk that the harm will occur,'
> the Jibrils would be unable to meet their
> burden of establishing standing.

*Jibril III*, 2023 WL 2240271, at *6 (emphasis added) (citations
and some internal quotation marks omitted). The Court of Appeals

for the Fourth Circuit ("Fourth Circuit") reached a similar conclusion in *Long*: "The [TSC] has removed Long from the No Fly List and has assured us that won't change based on the information it has now. Taking that assertion at face value, any future controversy over Long's No-Fly status is not only distant and hypothetical but would also depend on a new set of facts." 38 F.4th at 423; *see also Scherfen*, 2010 WL 456784, at *8 (concluding that removal from a TSDS watchlist "would render speculative any claim that Plaintiffs will *again* experience the kind of injury attributable to the alleged wrongful conduct that animates this litigation" (emphasis added)); *Bosnic v. Wray*, No. 3:17-cv-826, 2018 WL 3651382, at *4 (M.D. Fla. July 10, 2018) (finding it "not reasonably likely that Plaintiff will be added back to the No Fly List, based on existing circumstances"), *report and recommendation adopted*, No. 3:17-cv-826 (Aug. 1, 2018), ECF No. 32 at 1-2. The Fourth Circuit further held that it was "satisfied"—based on identical language to that in Plaintiffs' final determination letters, that "the government [would] only return Long to the No Fly List on a new factual record[,]" which could include, though not exclusively, "whatever information prompted it to add him in the first place."[18] *Compare Long*, 38 F.4th at 422, 425 (quoting DHS TRIP's

_____

[18] The Court of Appeals for the Ninth Circuit ("Ninth Circuit") reached an opposing conclusion in *Fikre v. FBI*, 35 F.4th 762

letter to Mr. Long, and a similar signed declaration from the

government, "that [he would] not be placed back on the No Fly

List based on the currently available information"), *with* Defs.'

_____

(9th Cir. 2022). In *Fikre*, the Ninth Circuit declined to moot
the plaintiff's claim after he was removed from the No Fly List
following the commencement of the litigation despite a
government declaration that he "was removed from the No Fly List
upon determination that he no longer satisfied the criteria for
placement on the [list]" and would "not be placed back on the
[list] in the future based on currently available information."
35 F.4th at 767. In its analysis of the voluntary cessation
exception to the mootness doctrine, the Ninth Circuit held that
the government's declaration did "not satisfy the heavy burden
of making it absolutely clear that the government would not in
the future return Fikre to the No Fly List for the same reason
it placed him there originally[,]" leaving the government
"practically and legally free to return to [its] old ways." *Id.*
at 771-72 (citation and internal quotation marks omitted).
However, the Court of Appeals for the Fourth Circuit ("Fourth
Circuit") rejected the Ninth Circuit's "strict application of"
the voluntary cessation doctrine to the government. *See Long*, 38
F.4th at 424-25 (determining that *Fikre* went "too far" and
"demand[ed] too much of the government" because "[t]o say
otherwise would be to suggest the government risked national
security simply to moot a lawsuit"); *see also Nur v. Unknown CBP
Officers*, No. 1:22-cv-169, 2022 WL 16747284, at *9 (E.D. Va.
Nov. 7, 2022) (following the approach in *Long* rather than *Fikre*
to find the plaintiff lacked standing); *Kovac*, 449 F. Supp. 3d
at 655 n.17 (distinguishing *Fikre* and finding the plaintiff's
challenge to his No-Fly status moot because DHS "informed Kovac
that he no longer satisfie[d] the criteria for placement, he was
removed, and he [would] not be placed back on the list based on
currently available information"). The Court reiterates its
prior determination, *see supra* note 16; that neither *Fikre* nor
*Long* directly apply, since they analyzed the voluntary cessation
doctrine, which imposes a heavy burden on the government to
prove mootness, in contrast to the standing analysis at issue
here, in which Plaintiffs bear the burden of proof, *see Jibril
III*, 2023 WL 2240271, at *7 n.2. In addition, both cases from
outside this Circuit are merely persuasive authority, but the
Court finds itself persuaded by *Long*, to the extent it supports
*Jibril III*'s position as to the speculative nature of
Plaintiffs' No Fly List redesignation arguments. *See id.* at *6.

Ex. D, ECF No. 23-5 at 2, & Ex. G, ECF No. 23-8 at 2 (exhibiting nearly identical assurances). "The plain lesson of these cases is that there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing," *Friends of the Earth*, 528 U.S. at 190; and since Plaintiffs have not alleged the existence of "new evidence that has or will come to light which would result in their reinstatement onto the No Fly List[,]" Defs.' Mot., ECF No. 23-1 at 29; the Court concludes that their "speculative chain of possibilities does not establish that injury based on potential future [redesignation] is certainly impending[,]" *Clapper*, 568 U.S. at 414.

Finally, Plaintiffs appear to argue that removal from the No Fly List should at least "not affect their standing to bring their due process and APA challenges to the policy itself—that is, the DHS TRIP procedures for [challenging] one's possible placement on the [No Fly] List." *Jibril III*, 2023 WL 2240271, at *6; *see* Pls.' Opp'n, ECF No. 25 at 17 (arguing that they have standing, despite their removals from the No Fly List, to challenge "the current regulatory framework" and request that the Court order DHS TRIP "to revise their procedures to provide Plaintiffs with an ability to meaningfully challenge future likely inclusions on the No Fly List"); Compl., ECF No. 22 at 26. Specifically, Plaintiffs argue that "under the legal

analysis urged by Defendants, [they] would not possess standing to challenge their placement on a watchlist until after they 'tested' that placement by attempting to travel, encountered difficulties, and suffered the effects of those injuries[,]" and that Defendants could "escape review" in "this or any future lawsuit" by removing individuals from the No Fly List "for the time being." Pls.' Opp'n, ECF No. 25 at 17. However, to pursue a challenge to the government's policy once their "request for specific relief is no longer at issue," Plaintiffs "must still demonstrate standing to challenge th[at] disputed policy or practice." *See Cause of Action Inst. v. Dep't of Just.*, 999 F.3d 696, 704 (D.C. Cir. 2021) (finding the plaintiff met that standard in establishing standing because it had "additional FOIA requests" pending with the Department of Justice and was thus "at risk of receiving the same improper treatment in the future" based on the application of the policy guidance).

Here, Plaintiffs have been removed from the No Fly List and are therefore not presently "at risk" of the same treatment they allegedly experienced in the past based on their prior placement on that list. *See id.*; *Jibril III*, 2023 WL 2240271, at *7 (concluding that the Jibrils would lack standing to challenge DHS TRIP procedures if they were removed from the Selectee List because then "there would be no agency policy 'continu[ing] to affect a present interest' asserted in the complaint"). Because

the Court has already concluded that the challenged policy—the DHS TRIP process for challenging one's No-Fly status—"[does] not continue to injure" Plaintiffs and does not pose "a substantial likelihood that it [will] injure them again in the future, they [do] not have standing to challenge that policy" in its entirety. *Jibril III*, 2023 WL 2240271, at *7; *see also Lyons*, 461 U.S. at 105-06 (holding that the plaintiff lacked standing to challenge the city's allegedly unconstitutional policy of using chokeholds, and concluding that his claim of having previously been subjected to the policy was insufficient to confer standing to challenge future applications of that policy); *Feinman*, 2009 WL 10692650, at *4 (deciding that the plaintiff lacked standing because she was unlikely to again be subjected to the FBI's alleged policy and that her additional attempt "to challenge the legality of the policy itself rather than a particular application of that policy [did] not permit her to simply sidestep the constitutional standing requirement"); *Bosnic*, 2018 WL 3651382, at *5 (negating the plaintiff's claim for declaratory relief as to the legality of the No Fly List nomination policies since those claims were moot after his removal from that list).[19]

---

[19] The Court acknowledges the possibility that the government could remove someone from the No Fly List during the pendency of litigation "to escape review." Pls.' Opp'n, ECF No. 25 at 17. The Court encourages caution regarding this possibility, but it

In sum, because Plaintiffs cannot show an ongoing, legally cognizable harm capable of redress today from their former No Fly List statuses, or certainly impending injury from the potential for redesignation to that list, the Court concludes that Plaintiffs have failed to establish standing to pursue their No Fly List claims and are constitutionally prohibited from proceeding to the merits of those claims. *See* Defs.' Mot., ECF No. 23-1 at 25; *Long*, 38 F.4th at 427 (reaching the same conclusion based on mootness grounds).[20]

_____

notes that Plaintiffs in this case have proffered no factual allegations in their complaint that the government specifically removed them from the No Fly List for the purposes of escaping judicial review (instead only mentioning this argument for the first time in their opposition brief). Since Plaintiffs have not pled any such allegations to substantiate this possibility, the Court declines in this instance to consider that the government might have "risked national security simply to" have this lawsuit dismissed on standing grounds. *See Long*, 38 F.4th at 425; *Bosnic*, 2018 WL 3651382, at *4 (finding that "the decision to remove Plaintiff from the No Fly List appear[ed] to be the result of substantial deliberation, and not merely an attempt to manipulate jurisdiction[,]" as there was "no evidence to suggest that Plaintiff's removal from the No Fly List was not a result of a genuine assessment of [his] DHS TRIP complaint"). Thus, to the extent Plaintiffs argue for "a pre-deprivation challenge to the No Fly List," Defs.' Reply, ECF No. 26 at 11 n.1; the Court rejects that attempt, *see Mohamed v. Holder*, No. 1:11-cv-50, 2015 WL 4394958, at *8 (E.D. Va. July 16, 2015) (concluding that "a balancing of the respective interests does not weigh in favor of pre-deprivation notice" of a No Fly List designation since such notice "would alert an individual, and through him or her, others, whom the government suspects of terrorist activity, and thereby compromise on-going investigations and endanger those persons involved in those investigations").

[20] The government also argues that "even if Plaintiffs ha[ve] standing, the Court lacks jurisdiction over their claims relating to the No Fly List because there is a special review

## 2. Plaintiffs Have Failed to Establish Standing to Pursue Their Selectee List Claims

---

procedure for challenging No Fly List determinations and related procedures: 49 U.S.C. § 46110 ("[§] 46110")." Defs.' Mot., ECF No. 23-1 at 15. § 46110 states that "a person disclosing a substantial interest in an order issued by . . . the Administrator of the [TSA] with respect to security duties and powers . . . may apply for review of the order by filing a petition for review in" the D.C. Circuit. 49 U.S.C. § 46110. The statute further states that the D.C. Circuit "has exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order[.]" *Id.* The D.C. Circuit recently embraced § 46110's review scheme to conclude that it has exclusive jurisdiction to review petitions challenging No Fly List designations made pursuant to a final order issued by the TSA Administrator. *Busic v. TSA*, No. 20-1480, 2023 WL 2565069, at *1 (D.C. Cir. Mar. 20, 2023); *accord Kashem v. Barr*, 941 F.3d 358, 391 (9th Cir. 2019). However, the Court does not view *Busic* as divesting it of jurisdiction in this instance because: (1) Plaintiffs are no longer on the No Fly List and thus cannot challenge the earlier order *maintaining* them on the list, and (2) they have not framed their complaint as challenging the final order *removing* them from the list. *See Busic*, 2023 WL 2565069, at *1 (noting that a traveler may challenge the TSA Administrator's final order either "'maintaining' or 'removing' [them] from the No Fly List"). In any event, the Court has concluded that Plaintiffs lack standing to pursue their No-Fly claims (in relation to both their former statuses and possible re-designations), so there remain no substantive claims to transfer to the D.C. Circuit. In addition, Plaintiffs' complaint asks for declaratory relief as to the DHS TRIP procedures for challenging future No Fly List designations, Compl., ECF No. 22 at 26; but the "procedures themselves are not an order within § 46110, . . . [so those] claims fall outside § 46110 jurisdiction[,]" *Long v. Barr*, 451 F. Supp. 3d 507, 530 (E.D. Va. 2020). *But see Mokdad v. Lynch*, 804 F.3d 807, 811-12 (6th Cir. 2015) (declining to opine whether § 46110 would deprive the district court of subject-matter jurisdiction over claims challenging the adequacy of the DHS redress process but noting that such challenges to the redress process could "amount to a challenge to a TSA order"). Ultimately, should Plaintiffs be re-designated to the No Fly List, they will need to "file a new redress inquiry[,]" which "could culminate in a final order by the TSA over which the [D.C. Circuit] would [then] have 'exclusive' jurisdiction." Defs.' Mot., ECF No. 23-1 at 32.

Presuming the truth of the allegations in Plaintiffs'
complaint and drawing all reasonable inferences in their favor,
*Rann*, 154 F. Supp. 2d at 64; the Court next concludes that the
remaining allegations in Plaintiffs' complaint specific to the
Selectee List, along with their current prayer for relief as to
that list, do not establish that Plaintiffs have standing to
pursue those claims.

Defendants argue that to the extent "Plaintiffs attempt to
premise their standing on their alleged continued placement on
'another watchlist'—by which Defendants assume Plaintiffs mean
the [TSDS] and its Selectee List subset—any such argument"
should fail for two reasons. Defs.' Reply, ECF No. 26 at 11.
First, Defendants argue that assuming Plaintiffs are currently
on the Selectee List, "the Second Amended Complaint does not
bring any actual claims based on such status[,]" *id.* at 12; and
that "in any event [it does] not allege that placement on [that
l]ist will result in harms equivalent [to those] associated with
the No Fly List (*e.g.*, an inability to travel)[,]" instead only
alleging risks "of being subject[ed] to additional screening and
delays at airports" when traveling in the future, Defs.' Mot.,
ECF No. 23-1 at 15, 25, 30. Second, Defendants note factual
allegations in the Complaint about travel incidents Plaintiffs
experienced following their removals from the No Fly List, such
as the extensive questioning and detention abroad that Mr.

Maniar experienced in August 2020 when he traveled to Turkey and Pakistan, *see* Compl., ECF No. 22 at 8-9 ¶¶ 45-47; and the difficulties Ms. Shaikh encountered in obtaining a boarding pass for a domestic flight in July 2020, *see id.* at 13-14 ¶¶ 89-91; but they argue that nothing in these allegations supports a finding that the incidents are fairly traceable to Defendants, nor "attributable to [Plaintiffs'] alleged placement on the Selectee List[,]" Defs.' Reply, ECF No. 26 at 12; Defs.' Mot., ECF No. 23-1 at 30. Plaintiffs rebut "Defendants['] attempt to reduce [their] harm [from the Selectee List] to the possibility that [they] may 'face delays and inconveniences when traveling,' [as] the realit[ies]" of extensive questioning, screening, and foreign detention are "substantially more severe." Pls.' Opp'n, ECF No. 25 at 15-16. In addition, they specifically allege that "these actions occurred due to the Defendants['] placement of [them] on the . . . Selectee List, and communication of that placement to other nations." *Id.* at 16.

After a careful analysis of Plaintiffs' Second Amended Complaint, the Court disagrees with the government's assertion that the Complaint "includes no well-pled" factual allegations regarding harms based on Plaintiffs' alleged placement on the Selectee List. *See* Defs. Mot., ECF No. 23-1 at 30; Defs.' Reply, ECF No. 26 at 12. To the contrary, it alleges that, shortly after his removal from the No Fly List, Mr. Maniar was

extensively questioned in Turkey before being allowed to board his flight to Pakistan, and that upon arrival in Pakistan, he was detained and again questioned extensively before being forced to immediately return to the U.S., where he was also extensively screened. Compl., ECF No. 22 at 8-9 ¶¶ 45-47; *see also* Pls.' Opp'n, ECF No. 25 at 16 (adding that Mr. Maniar was detained in Pakistan "by unknown government agents[] and taken to an unidentified location with a bag over his head during travel"). The Complaint notes that these travel experiences "are consistent with persons on the Selectee List" and specifically alleges that "Plaintiff Maniar believes these actions occurred due to [ ] Defendants placing him on the . . . Selectee List" and communicating that list to other countries. Compl., ECF No. 22 at 9 ¶¶ 47, 49. The Complaint also alleges that Ms. Shaikh's difficulties, following her removal from the No Fly List, in obtaining a boarding pass for a domestic flight and subsequently receiving a boarding pass with the notation "SSSS" are experiences "consistent with persons on the Selectee List." *Id.* at 14 ¶ 93. Both Plaintiffs furthermore claim that their "believed current placement on the Selectee List" infringes on their religious exercise and ability to travel. *Id.* at 10 ¶ 61, 15 ¶ 100. Thus, contrary to Defendants' claims, the Second Amended Complaint not only "challenge[s Plaintiffs'] alleged Selectee List placement," but also alleges "comparable" harms,

such as severely restricted travel abilities (*i.e.*, Mr. Maniar being forced to immediately book travel back to the U.S. upon arrival in Pakistan), detention abroad (which, drawing all inferences in Plaintiffs' favor, resulted from their inclusion in the TSDS and the global dissemination of that information, as opposed to the random "actions of foreign governments" detaining or denying admission to traveling U.S. citizens), and excessive screening and questioning (including FBI agents asking invasive personal questions about Plaintiffs to their acquaintances). *Compare* Defs.' Mot., ECF No. 23-1 at 30, *and* Defs.' Reply, ECF No. 26 at 11-12, *with* Compl., ECF No. 22 at 9 ¶ 47, 10 ¶¶ 57-59, 13 ¶ 90, 14 ¶¶ 95-97.

Plaintiffs' factual allegations, taken as true, "lead to the reasonable inference that [they] will again be subjected to many of the alleged illegalities they challenge in this action" should they attempt to travel again, which appears plausible from the Complaint. *Jibril II*, 20 F.4th at 812. Plaintiffs' travel history abroad for employment and religious purposes, and their existing family ties to Pakistan, "combined with their professed desire to continue" traveling for those reasons, "strongly suggest[] that they will travel internationally within the next year or two." *Id.* at 814. For example, Mr. Maniar's ongoing commercial ventures in Malaysia, Compl., ECF No. 22 at 5 ¶ 15; Ms. Shaikh's inability to visit family members in Pakistan

during the two years she was on the No Fly List, *id.* at 14 ¶ 99;
and Mr. Maniar's immediate travel to Pakistan just twelve days
after the lifting of his No-Fly status, *id.* at 8 ¶¶ 44-45;
provide support for this inference, *see Jibril II*, 20 F.4th at
814. "It is also noteworthy that [Plaintiffs'] sincerely held
religious beliefs require them to travel to Saudi Arabia to
fulfill religious obligations[,]" *id.;* which they have both done
in the past and have professed an intent to do again in the
future, Compl., ECF No. 22 at 5 ¶¶ 15-17, 15 ¶ 100-01. These
allegations enable the Court to infer that Plaintiffs "will soon
travel again," opening them up to "a substantial risk of future
harm" from more searches, screenings, interrogations, and
detentions. *See Jibril II*, 20 F.4th at 812, 814 ("The Jibrils'
allegations plausibly support their claim that they will soon
fly again and . . . [be] expose[d] to an imminent risk of
invasive and undue Government actions[.]").

Caselaw supports the conclusion that Plaintiffs can allege
"concrete travel plans." *Ghedi v. Mayorkas*, 16 F.4th 456, 465
(5th Cir. 2021). For example, in *Jibril II*, the D.C. Circuit
rejected the government's contention that the Jibrils had only
alleged "'some day' intentions" to travel, as was the case for
the plaintiffs in *Lujan v. Defenders of Wildlife*, 504 U.S. 555,
564, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). 20 F.4th at 815.
Based on the *Lujan* plaintiffs' affidavits that they intended to

travel abroad but "had no current plans" to do so, the U.S. Supreme Court concluded that their previous travel "prove[d] nothing," and only "'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be"—could not support an imminent future injury sufficient to confer standing. *Lujan*, 504 U.S. at 564. The D.C. Circuit concluded that *Lujan* "is easily distinguishable, as the Jibrils allege[d] an extensive travel history supporting their future plans, which evince[d] an imminence the *Lujan* plaintiffs' 'some day' intentions lacked." *Jibril II*, 20 F.4th at 815 (some internal quotation marks omitted); *see also Ghedi*, 16 F.4th at 465 (concluding that a plaintiff, purportedly on the Selectee List, who "allege[d] both a professional need for habitual travel and that his injuries [were] tied to the *act of flying*, not his destination" plausibly pled "that his next flight, and thus, injury, [wa]s both real and immediate" and that the government's attempt to compare his case to *Lujan* was "an apples-to-oranges comparison").

That the Complaint only states Plaintiffs' *beliefs* that these actions occurred due to their placement on the Selectee List, *see* Defs.' Mot., ECF No. 23-1 at 30; does not necessarily prevent the Court, at the motion-to-dismiss stage, from accepting the truth of these allegations, especially since the government "does not disclose the status of any individual with

respect to the TSD[S], or its subset lists[,]" *id.* at 14 n.1.[21]
Drawing all reasonable inferences in their favor, as it must,
the Court concludes that Plaintiffs have plausibly alleged that
they appeared on a terrorist watchlist in 2020. The Court
"infer[s] from the inclusion of 'SSSS' on [Ms. Shaikh's]
boarding pass[]" from her July 2020 domestic flight, along with
her inability to obtain that boarding pass without speaking with
airline officials, and from "the extensive searches and
interrogation [Mr. Maniar] endured during [his] international
travels" in Turkey and Pakistan in August 2020 that they both
"appeared on a terrorist watchlist during [those] trip[s]."
*Jibril II*, 20 F.4th at 815. The D.C. Circuit in *Jibril II* used
nearly identical experiences to those of Plaintiffs, including
extensive searches and screenings, interrogations, and prolonged
detainment, which it labeled "severe and time-delaying"
treatment, to infer that the Jibrils appeared on the Selectee
List in 2018 at the time of their travels. *Id.* at 815-16; *see
also Scherfen*, 2010 WL 456784, at *3, *7 (finding that the
plaintiffs' complaint alleging additional screenings at airport
security checkpoints, difficulties obtaining a boarding pass,
detention during travel, and advisement that they were "on some

---

[21] In fact, the government states that the Court must, pursuant
to Federal Rule of Civil Procedure 12(b), accept as true
"Plaintiffs' apparent allegations that they are now on the
Selectee List." Defs.' Mot., ECF No. 23-1 at 14 n.1.

watch list" supported "a fair inference that [they] ha[d] experienced intensified screening as a result of inclusion in the TSD[S]"); *Shearson v. Holder*, 725 F.3d 588, 592 (6th Cir. 2013) (noting the conclusion of other courts that "a traveler's subjection to heightened searches while entering the United States can be an indicator that an individual is on a terrorist watchlist"). Thus, the Court concludes that Plaintiffs have plausibly alleged imminent injury that "is plainly traceable to the [g]overnment's actions," *Jibril II*, 20 F.4th at 817; thereby negating Defendants' argument to the contrary, *see* Defs.' Reply, ECF No. 26 at 12 ("[N]othing in Plaintiff Maniar's allegations supports any finding that the actions of the Pakistani Government are fairly traceable to [ ] Defendants."); Defs.' Mot., ECF No. 23-1 at 30 (attempting to argue that the alleged injuries resulted "from the independent actions of some third party not before the court").

Despite Plaintiffs' plausible satisfaction of the first two standing elements, however, the Court concludes that Plaintiffs have failed to satisfy their burden to prove the redressability aspect of their Selectee List harms. "To demonstrate that a claimed injury is redressable requires [Plaintiffs] to show that the [C]ourt possesses the authority to grant the remedy requested." *Taylor*, 351 F. Supp. 3d at 104; *see also Swan v. Clinton*, 100 F.3d 973, 976-77 (D.C. Cir. 1996) (stating that the

"'redressability' element of standing . . . causes [ ] concern"
when the federal court does not have the power to grant the
plaintiff's requested relief); *West*, 845 F.3d at 1236 (noting
that "redressability focuses on the connection between the
alleged injury and the judicial relief requested" (citation and
internal quotation marks omitted)). In other words, "[t]he
redressability inquiry, to which the [C]ourt now turns, poses a
simple question: If [P]laintiffs secured the relief they sought,
. . . would [it] redress their injury?" *Taylor*, 351 F. Supp. 3d
at 104 (citations and internal quotation marks omitted).

However, this question is not so "simple" in Plaintiffs'
case because the Complaint, as written, does not indicate the
specific declaratory and injunctive relief Plaintiffs are
seeking regarding the Selectee List. The Court finds that
Plaintiffs' causes of action "based on the No Fly List and the
TSD[S] are so intertwined that it is difficult to evaluate
[their] claims based on the [Selectee List alone] now that [they
have] been removed from the No Fly List." *Bosnic*, 2018 WL
3651382, at *5. Although Plaintiffs were given leave to amend
their complaint following their removals from the No Fly List
and did so twice to reflect this change, *see* First Am. Compl.,
ECF No. 19; Second Am. Compl., ECF No. 22; as discussed above,
their operative complaint continues to maintain claims related
to the No Fly List, including allegations of ongoing injury

related to that list, the possibility of redesignation to that list, and procedural insufficiencies related to the process for challenging future inclusion on that list, *see* Pls.' Opp'n, ECF No. 25 at 15-17. Claims related to the No Fly List dominate the operative complaint, and in their prayer for relief, Plaintiffs mention only the No Fly List, *see* Compl., ECF No. 22 at 26 (requesting that the Court "[o]rder DHS TRIP to provide persons with meaningful opportunities to challenge future inclusion on the *No Fly List* moving forward (emphasis added)); while only generally requesting that the Court declare that Defendants' actions "violated, and continue to violate" their rights under the First and Fifth Amendments and the APA, *see id.* at 25-26. Plaintiffs thus never mention the Selectee List by name in their request for prospective relief. *See id.*

Instead, in the "Causes of Action" section of their complaint, Plaintiffs allege, without reference to either list by name, that they "have suffered punishments, including the inability to fly, substantial burdens on their religious exercise, the inability to engage in chosen employment, and more," including, injury to their reputations and stigmatization by the government and in their community. *See id.* at 20-21 ¶¶ 148-49 (appearing in Count One: "Violations of Plaintiffs' Fifth Amendment Procedural Due Process Rights"). The Court notes that these alleged Fifth Amendment violations could refer to factual

allegations in the Complaint pertaining to both the No Fly and Selectee Lists; however, the Selectee List is only named under Count Four: "Violations of the First Amendment." *See id.* at 23-24 ¶ 180 (stating that "Defendants' supposed demotion of [Plaintiffs] to the Selectee List still creates a risk that they will likely be detained internationally or prohibited from traveling overseas altogether"). The Court therefore concludes that the Complaint fails to clearly request a specific remedy for Plaintiffs' Selectee List claims, separate and apart from that requested for their No Fly List claims, such that the Court could be certain that there remains any requested prospective relief that could redress injuries related to the Selectee List. *See, e.g.*, *id.* at 10 ¶ 61 (combining Mr. Maniar's "former designation on the No Fly List, believed current placement on the Selectee List, and substantial likelihood that he could again be placed on the No Fly List" as the reasons for the alleged constitutional infringements requiring redress).

For example, in *Jibril II*, the plaintiffs "ask[ed] the court to order the Government to revise its TRIP policies" as to the Selectee List redress process and "then re-examine [their] inquiries" regarding "the extensive and intrusive security screenings they endured [ ] consistent with the Government's treatment of Selectee List travelers." 20 F.4th at 810-11. Here, however, as part of their prayer for relief, Plaintiffs have not

asked for redress regarding the sufficiency of the procedures involved in challenging potential Selectee (as opposed to No Fly) List inclusion, nor have they asked for removal from the Selectee List or the TSDS as a whole. *See, e.g.*, *Scherfen*, 2010 WL 456784, at *1 ("Plaintiffs seek a declaratory judgment as well as injunctive relief in the form of 'removal of Plaintiffs from any watch lists or databases that inhibit their travel in any manner.'"). Moreover, Plaintiffs have not alleged that they attempted the DHS TRIP process in relation to their 2020 travel experiences, which as Plaintiffs admit, "represents [their] only administrative avenue of redress" before proceeding to judicial review. Compl., ECF No. 22 at 6 ¶ 34, 11 ¶ 76. In other words, Plaintiffs have alleged the resolution of their DHS TRIP inquiries as to their No Fly List status, but not whether they ever began or followed through to completion such inquiries following their 2020 Selectee List suspicions. And completion of "the only redress process available to them" is necessary for the Court to reasonably infer, for purposes of redressability, that they may remain on the Selectee List today. *See Jibril II*, 20 F.4th at 816-17 (inferring that the Jibrils remained on the Selectee List when they completed the DHS TRIP process and the government "provided no information to the contrary"). Thus, the Court is not persuaded that Plaintiffs' alleged Selectee List injuries are redressable by a favorable judicial decision

because: (1) they have not alleged completing the DHS TRIP process as to their 2020 travel experiences, and (2) they have not asked for any specific relief that might affect their alleged placement on that list or the procedures involved in challenging such placement. *Cf. id.* at 817 (concluding that "the prospective relief the Jibrils [sought], including revisions to the TRIP policies [as to the Selectee List], would ameliorate the alleged future harms with respect to which they complain").

In sum, the operative Complaint does not make clear what redress Plaintiffs seek for their remaining claims. It is also unclear "whether [they] remain[] on any [ ] federal terrorist watchlist or whether [they are presently] being injured by [their] presence on any such list." *Bosnic*, 2018 WL 3651382, at *5. Accordingly, the Court concludes that Plaintiffs have failed to meet their burden to establish all three elements of standing as to their Selectee List claims, and that it must grant Defendants' Motion to Dismiss and dismiss without prejudice the Second Amended Complaint. The Court, however, "will not dismiss the action itself at this time[,]" and will instead afford Plaintiffs the chance to file an amended complaint, as they are in the best position to disentangle their Selectee List claims from their nonjusticiable No Fly List claims. *See Momenian v. Davidson*, No. 1:15-cv-00828, 2016 WL 259641, at *7 (D.D.C. Jan. 21, 2016) (similarly granting the defendant's motion to dismiss,

67

dismissing the plaintiffs' complaint without prejudice, and granting the plaintiffs time to file an amended complaint to address timeliness issues); *see also Ciralsky v. CIA*, 355 F.3d 661, 666-67 (D.C. Cir. 2004) (distinguishing between dismissal of the complaint and dismissal of the action); *Food & Water Watch*, 808 F.3d at 913 ("[A]n inability to establish a substantial likelihood of standing requires denial of the motion [to dismiss], not dismissal of the case."). The Court will afford Plaintiffs 30 days from this date to file an amended complaint should they choose to do so.[22] *See Bosnic*, 2018 WL 3651382, at *1, *5 (recommending that the plaintiff's claims based on the TSDS "be re-pled in light of his removal from the No Fly List so that the [c]omplaint [could] reflect[] his present circumstances"). If Plaintiffs amend their complaint, the government may file a motion to dismiss that complaint.

Because the Court has concluded that Plaintiffs presently lack standing to pursue their No Fly List and Selectee List claims, the Court lacks subject-matter jurisdiction to consider

---

[22] Federal Rule of Civil Procedure 15(a) provides that leave to file an amended complaint should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). Where the court grants a plaintiff leave to file an amended complaint, the amended complaint supersedes the prior complaint(s) to become the operative complaint. *Nat'l City Mortg. Co. v. Navarro,* 220 F.R.D. 102, 106 (D.D.C. 2006) (citing *Washer v. Bullitt Cnty.,* 110 U.S. 558, 562, 4 S. Ct. 249, 28 L. Ed. 249 (1884)).

whether the Complaint also fails to state a claim upon which relief can be granted.[23]

## V.   Conclusion

For the foregoing reasons, the Court **GRANTS** Defendants' Renewed Motion to Dismiss, ECF No. 23; and **DISMISSES WITHOUT PREJUDICE** Plaintiffs' Second Amended Complaint for Injunctive and Declaratory Relief, ECF No. 22.

Plaintiffs shall file, by no later than **May 1, 2023**, an amended complaint that addresses the Court's concerns stated herein. If Plaintiffs do not timely file an amended complaint, the Court will enter a final, appealable order dismissing this case.

---

[23] Because the Court reaches this conclusion, it does not consider Defendants' additional argument that Plaintiffs have improperly attempted "to expand the reach of their claims to agencies other than TSA, DHS, and the [TSC.]" *See* Defs.' Reply, ECF No. 26 at 9, 31-32; Defs.' Mot., ECF No. 23-1 at 54-56. Additionally, should the Court ever determine "that Plaintiffs have standing to challenge their placement on the Selectee List," Defendants seek to "preserve[] . . . for the record" an argument that 49 U.S.C. § 46110 would deprive the Court of jurisdiction over a procedural due process challenge to the DHS TRIP redress procedures involving the Selectee List. Defs.' Mot., ECF No. 23-1 at 30, 34. While the Court need not fully address this issue today, it notes that this argument would likely fail because § 46110 gives the D.C. Circuit exclusive jurisdiction over final determinations made by the TSA Administrator "concerning listing on the No Fly List[,]" not the Selectee List. *See* 49 U.S.C. § 46110; Watchlisting Overview, ECF No. 23-2 at 10 n.5. Moreover, as noted above, any challenge to the DHS TRIP procedures involving the Selectee List would likely be outside the purview of § 46110 because the "procedures themselves are not an order within § 46110[.]" *Long*, 451 F. Supp. 3d at 530.

An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:     Emmet G. Sullivan**
**United States District Judge**
**March 30, 2023**